UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF TEXAS

VICTORIA DIVISION

United States Courts
Southern District of Texas
FILED
APR 29 2010
David J. Bradley, Clerk of Court

| | |
|---|---|
| UNITED STATES OF AMERICA § | |
| § | |
| v. § | CRIMINAL NUMBER **V-10-51** |
| § | |
| FLEET MANAGEMENT LIMITED § | |

INDICTMENT

THE GRAND JURY CHARGES THAT:

COUNT ONE

At all times material to this Indictment,

**A. THE ACT TO PREVENT POLLUTION FROM SHIPS REQUIREMENT THAT VESSELS MAINTAIN AN OIL RECORD BOOK.**

1. The Act to Prevent Pollution from Ships ("APPS"), 33 U.S.C. §§ 1901 *et seq.*, was enacted by Congress in 1980 to implement two related international treaties to which the United States is a signatory: (1) the 1973 International Convention for the Prevention of Pollution from Ships, and (2) the Protocol of 1978 Relating to the International Convention for the Prevention of Pollution from Ships. Together, these treaties were known as "MARPOL 73/78" (MARPOL).

2. MARPOL was the result of an international consensus that the release of oil and other harmful substances from ships constitutes a serious source of pollution. It is the stated desire of the United States and other party nations to MARPOL to achieve the complete elimination of international pollution of the marine environment by oil and other harmful substances. Parties to MARPOL were required to implement the provisions of the treaty. The Act to Prevent Pollution from Ships, 33 U.S.C. § 1901 *et seq.*, made MARPOL applicable to vessels while in the ports

and navigable waters of the United States. Federal regulations implement MARPOL and serve to prevent pollution in international waters and in the ports and navigable waters of the United States. 33 U.S.C. § 1907(c)(1) and (c)(2); 33 C.F.R. §§ 151.01 *et seq.*

3. All ocean-going (non-oil tanker) vessels of 400 gross tons or more were required under MARPOL and applicable federal regulations to maintain an Oil Record Book. During a typical voyage, large amounts of oily water collect in a ship's bilges and must be discharged for the ship to remain seaworthy. To facilitate the discharge of these oily bilge wastes without causing pollution, virtually all large ships were equipped with a pollution-control device known as an oil-water separator, including an oil content meter, which processes oil-contaminated bilge wastes by separating the oil from water and retaining the oily waste onboard.

4. MARPOL and regulations implemented pursuant to APPS provided that only wastewater containing no more than fifteen parts per million (ppm) of oil may be discharged from certain vessels directly to the sea. 33 C.F.R. § 151.10(a)(5) and (b)(3). Oil residue created by the operation of an oil-water separator must be properly disposed of, for example, by collecting it in a tank for proper disposal upon a ship's entry into port. 33 C.F.R. § 151.10.

5. To assure that oily bilge wastewater is properly processed and disposed of, the regulations implemented pursuant to APPS and MARPOL provide that, with regard to ocean-going (non-oil tanker) vessels of 400 gross tons or more, the person or persons in charge of an operation are required to fully record, on a tank-to-tank basis, the disposal of oil residue, discharges overboard and disposals otherwise of oily mixtures, slops from bilges and bilge water that accumulated in machinery spaces in a special engineering log known as an Oil Record Book. Each Oil Record Book contains clear and explicit directions as to how entries are to be

completed and how the Oil Record Book is to be maintained. Oil Record Book entries must include the date of each operation, the time of day when the operation began and ended, and the quantity of oil-contaminated water pumped from the bilges to a holding or other tank, and tank-to-tank. Similarly, upon processing the oily bilge waste in the oil-water separator, the responsible officer is required to record the time and date of that operation, the quantity of oil-contaminated water processed, the latitude and longitude at which the operation began and ended, and to sign or initial his name after every entry in the Oil Record Book. Any transfer or disposal of waste oil sludge must also be recorded in the Oil Record Book. 33 C.F.R. §§ 151.25(a), (d), and (h).

6. The United States Coast Guard was authorized to conduct inspections to determine whether vessels in United States waters and ports are in compliance with MARPOL, APPS and other applicable federal regulations. In connection with such inspections, the Coast Guard was authorized to examine the vessel's International Oil Pollution Prevention Certificate, the vessel's Oil Record Book and other engineering logs to determine, among other things, whether the vessel had operable pollution prevention equipment, whether it posed any danger to United States ports and waters, and whether the vessel had discharged any oil contaminated water in violation of law. 33 C.F.R. § 151.23(a)(3). In conducting inspections, the Coast Guard relies on a ship's documents, including the Oil Record Book, statements of the crew and inspection of the ship's machinery including the pollution control equipment and tanks to determine whether the vessel's crew was properly handling oil contaminated water and its disposal in compliance with law. 33 C.F.R. § 151.23(c).

7. The Coast Guard is authorized to detain a vessel, deny it entry into a United States

port, or take other action with regard to vessels that were not in substantial compliance with MARPOL or APPS. 33 C.F.R. § 151.07(b).

### B. THE M/V LOWLANDS SUMIDA.

8. The Motor Vessel (M/V) *Lowlands Sumida* was an ocean-going bulk carrier weighing approximately 37,689 gross tons and was therefore subject to MARPOL and APPS and the implementing federal regulations. The M/V *Lowlands Sumida* was registered in the Republic of Panama and bore International Maritime Organization Registry Number 9170274. The M/V *Lowlands Sumida* was equipped with an oil-water separator and oil content meter.

9. The M/V *Lowlands Sumida* had a crew of approximately 22 people. Approximately nine (9) seamen of different ranks worked in the vessel's engine department, including a Chief Engineer, Second Engineer, Third Engineer, additional Third Engineer, an Engineer Cadet, several Motormen and a Fitter. The Motormen typically assisted the Engineers in operating, cleaning and maintaining some of the engineering machinery.

### C. THE CORPORATE DEFENDANT.

10. The defendant, FLEET MANAGEMENT LIMITED, is a company incorporated in Hong Kong and headquartered at 18/f MassMutual Tower, 38 Gloucester Road, Wanchai, Hong Kong. The defendant, FLEET MANAGEMENT LIMITED, operated the M/V *Lowlands Sumida* pursuant to an agreement between FLEET MANAGEMENT LIMITED and the vessel's owners. Under that agreement the defendant, FLEET MANAGEMENT LIMITED, (by and through its shore side employees and senior crew members on board the M/V *Lowlands Sumida*, who were acting within the scope of their employment and at least in part for the benefit of said defendant) provided management services to the owners of the M/V *Lowlands Sumida* and was responsible

for, among other things, hiring and directing all crew members serving on the vessel, and was responsible for performing and paying (for the owner's account) all maintenance and repairs to the vessel, including the installation of new equipment, and environmental compliance including responsibility for the discharge of wastes to shore. The engine room officers were the on board employees of the defendant, FLEET MANAGEMENT LIMITED, and acted at all times at the direction of and at least in part for the benefit of said defendant.

11. On or about October 6, 2009, in the Port of Point Comfort, Texas, in the Victoria Division of the Southern District of Texas, and within the internal waters of the United States, the defendant, FLEET MANAGEMENT LIMITED, (by and through its senior crew members on board the M/V *Lowlands Sumida*, who were acting within the scope of their employment and at least in part for the benefit of said defendant), did knowingly fail, and cause the failure, to maintain accurately an Oil Record Book for the M/V *Lowlands Sumida* in which all operations were accurately recorded, including all disposals of oil residues and discharges overboard and disposals otherwise of oily mixtures, slops from bilges and bilge water that accumulated in machinery spaces involving the movement of oil, on a tank-to-tank basis, including all transfers of waste oil sludge and oil-contaminated bilge waste.

All in violation of Title 33, United States Code, Section 1908(a); Title 33, Code of Federal Regulations, Section 151.25; and, Title 18, United States Code, Section 2.

COUNT TWO

12. The allegations contained in paragraphs 1 through 10 of Count One are re-alleged as though set forth in full and incorporated herein.

13. On or about October 6, 2009, in the Port of Point Comfort, Texas, in the Victoria Division of the Southern District of Texas, and in the internal waters of the United States, the defendant FLEET MANAGEMENT LIMITED, (by and through senior crew members on board the M/V *Lowlands Sumida*, who were each acting within the scope of their employment and at least in part for the benefit of said defendant), in a matter within the jurisdiction of the United States Coast Guard and the Department of Homeland Security, did knowingly and willfully use and cause to be used a materially false writing, to wit: the Oil Record Book for the M/V *Lowlands Sumida*, knowing the same to contain a materially false, fictitious, and fraudulent statement, entry and representation, in that the Oil Record Book for the M/V *Lowlands Sumida*, failed to state and omitted the fact that the vessel's oil-water separator had been by-passed, the fact that oily wastewater with an oil content of greater than 15 ppm had been discharged overboard directly into the ocean, and the fact that there were transfers of oily wastewater and sludge into and out of the #5 Center Fuel Oil Tank, when in truth and in fact, as the defendant then and there well knew, some volume of the oil-contaminated bilge wastes of greater than 15 ppm not recorded in the Oil Record Book had been discharged overboard directly into the ocean by tricking the Oil Content Meter on the ship's oil-water separator thereby bypassing the oil-water separator and that oily wastewater and sludge, not recorded in the Oil Record Book, had been transferred into and out of the #5 Center Fuel Oil Tank.

All in violation of Title 18, United States Code, Sections 1001(a) and 2.

## COUNT THREE

14. The allegations contained in paragraphs 1 through 10 of Count One are re-alleged as though set forth in full and incorporated herein.

15. Between at least on or about September 1, 2009, and continuing to October 6, 2009, within the Victoria Division of the Southern District of Texas and elsewhere within the jurisdiction of the Court, the defendant, FLEET MANAGEMENT LIMITED, (by and through senior crew members on board the M/V *Lowlands Sumida*, and shore side employees, who were each acting within the scope of their employment and at least in part for the benefit of said defendant), with the intent to impede, obstruct and influence the investigation or proper administration of a matter within the jurisdiction of the Department of Homeland Security and the United States Coast Guard and in relation to and in contemplation of an investigation and matter within the jurisdiction of the Department of Homeland Security and the United States Coast Guard did knowingly alter, conceal, cover up, falsify and made a false entry in a record, document and tangible object, and made, and cause to be made, altered, concealed covered up and falsified an entry in a record, document and tangible object, to wit: the defendant physically altered and caused to be physically altered the #5 Center Fuel Oil Tank on board the M/V *Lowlands Sumida* by re-installing and causing to be re-installed a "dummy" or "blank" sounding tube in said tank for the purpose of concealing the true contents and level of oily wastewater and sludge in the #5 Center Fuel Oil Tank knowing said tank was subject to inspection by the United States Coast Guard, and recorded, and cause to be recorded, "0" in the vessel's Engine Room Sounding Log as the level of liquid material contained in the #5 Center Fuel Oil Tank onboard the M/V *Lowlands Sumida,* when the defendant well knew that the #5 Center Fuel Oil Tank onboard the M/V *Lowlands Sumida* contained a volume of oily wastewater and sludge greater than "0" and that said Engine Room Sounding Log and tank were subject to inspection by the United States Coast Guard.

All in violation of Title 18, United States Code, Sections 1519 and 2.

A TRUE BILL:
<u>ORIGINAL SIGNATURE ON FILE</u>
FOREPERSON OF THE GRAND JURY

JOSE ANGEL MORENO
UNITED STATES ATTORNEY

By: *[signature]*

HOWARD P. STEWART
Senior Litigation Counsel
Environmental Crimes Section
Washington, D.C.